JOYNES, J.
The only point decided by the Circuit Court was, that the bond held by DeVoss , imposed no valid obligation *on the city, and the propriety of that decision is the only question upon which our decision has been invoked.
The bill proceeds upon the assumption that the decree of the court of the Confederate States, by which the bond held by Otis is alleged to have been sequestered and confiscated, and in pursuance of which it was sold, did not protect the city against his claim, after the suppression of the Confederate Government. This assumption is controverted by the answer of DeVoss, which denies that rights growing up under the laws of that government and the decrees of its courts, while it was de facto the government, expired with it on its overthrow. This question,- however, was not discussed in the argument in this court. The proceedings and decree of the Confederate court are not exhibited, nor their existence even admitted by the pleadings; and though the existence of a law for the confiscation of the property of alien enemies is admitted, the special terms of the law do not appear. There are not sufficient materials in the record, therefore, to enable the court to consider and decide upon the legal effect of the decree of confiscation, if we were asked to do so. And accordingly, ,we have not considered that question. I shall assume, for the purposes of the case, as was assumed in the argument, that the decree of confiscation and the proceedings under it did not affect the title of Otis to claim payment of the bond held by him, or, of themselves, give validity to the bond held by DeVoss. And besides, it would not be competent to consider the effect of that decree as between the City and Otis, because no such question has been raised in the pleadings. Whatever may be the rights of DeVoss, the City is not at liberty, on the present pleadings, to controvert the title of Otis.
It is conceded that the bond held by De-Voss was executed and issued to him by the officers of the city to whom was entrusted, by its laws, the general duty of executing *and issuing bonds. In the argument for the appellants, these officers were treated as the agents of the City, and the general principles of the law of agency were regarded as applying to the City in respect to the acts and functions of such officers, in like manner as to other corporations and their officers and servants.
Eor the appellee it was contended that the functions of these officers in reference to the execution, transfer, and renewal of bonds of the city, pertain to the execution by the City of the powers and duties devolved upon it in the character of a local government, and that the City cannot be held liable for their misfeasance or negligence in the discharge of those functions, according to the principles on which this court proceeded in City of Richmond v. Long’s adm’r, 17 Gratt. 375.
But that principle has no application to this case. The power which was in question in the case referred to, was one of those conferred upon the city for public purposes only, and pertained to its character as a local government. It was not conferred with any view to the private advantage or emolument of the City. But the power to borrow monej' is bestowed primarily for the advantage and benefit of the City. It has no direct relation to the powers and duties of the City as a local government. It may be exercised in a particular case with a view to the better execution of those powers and duties, but it is not essential to their execution. It involves no exercise of sovereign power over the persons or property of the citizens, but is such a power as may be exercised by a private individual, or by an ordinary trading or commercial corporation. Such a power is entirely distinct, in contemplation of law, from those which are bestowed upon the City for public purposes *637 only, and pertain to its functions as a local [ government, exercising, for that purpose, a portion of the sovereign power of the State. The city, quoad hoc, is a ^private corporation. This distinction is taken by Sir Bloyd Kenyon, Master of the Eolls, in Moodaly v. East India Company, 1 Brown C. C. 469. The plaintiff had taken a lease from the Company granting him permission to supply the inhabitants of Madras with tobacco for ten years. Before the term was out, the Company dispossessed the plaintiff, and granted the privilege to another. The plaintiff filed a bill of discovery, with a view to bringing an action against the Company. It was objected on behalf of the defendants, that the act complained of was incident to their character as a sovereign power, and could not be made the subject of a suit. His Honor admitted that no suit would lie against a sovereign power for any thing done in that capacity; but he held that the defendants, in that case, did not come within the rule. He said: “They have rights as a sovereign power; they have also duties as individuals; if they enter into bonds in India, the sums secured may be recovered here. So in this case, as a private company, they have entered into a private contract, to which they must be liable.”
The power to borrow money is, of course, a discretionary power, to be executed or not, at the pleasure of the City, and in such manner as it may see fit. But when the City, through its proper authorities, has determined to exercise this power, and has prescribed how the bonds shall be executed, how they shall be transferred, and how new bonds shall be issued to the assignees, duties devolve upon the City which are absolute and purely ministerial. The holder of a bond has a right to transfer it. The City is bound to allow the transfer; to make the proper registry; and to issue a new bond to the assignee. For a refusal to perform these duties, an action will lie against the City, though perhaps the performance of them cannot be enforced by mandamus. Angelí & Ames on Corp. \ 381, § 710. The City may, and, indeed, must, from the necessity x'of the case, confide the performance of these duties to officers and agents; but they perform them in the place and stead of the City; their acts, in the execution of these duties, are the acts of the City. They are the mere agents and servants of the City, and in such a case the maxim respondeat superior applies. Sawyer v. Corse, 17 Gratt. 230. See Bailey v. Mayor &c. of New York, 3 Hill R. 531; City of Dayton v. Piase, 4 Ohio N. S. R. 80; Clark v. Mayor &c. of Washington, 12 Wheat. R. 40; Thayer v. Boston, 19 Pick. R. 511; Weightman v. Corporation of Washington, 1 Black. U. S. R. 39; Conrad v. Ithaca, 16 N. Y. R. 158, and cases cited.
It was contended for the appellee that De-Voss must be taken to have had notice of the character and history of the bond issued to him. It is not pretended that he had actual notice, and it is very clear that he did not have such notice. But he purchased the bond from R. H. Maury & Co., by whom it was transferred to him in February, 1863; and it was transferred to them in October, 1862, by H. B. Brooke, receiver, under the decree of confiscation. From this, it is argued, DeVoss must be charged with constructive notice of the character of the bond, which he might have ascertained if he had traced it back through the books of the Auditor. But I do not think so. The bond delivered to DeVoss by Maury & Co. was perfectly regular on its face. DeVoss had no reason to suspect that it was a bond issued in lieu of one that had been confiscated, but he had the best reason to believe the contrary. For 1. The bond did not contain the statement which such bonds were required to contain by the resolution of the Council. And 2. Maury & Co. knew that DeVoss would not purchase such bonds, and their delivery of this bond to him was an assurance that it did not belong to that class. It does not appear that he ever saw the bond which Maury & Co. held; but if he had seen it,, that, too, *was regular on its face. There was nothing-, therefore, to excite his suspicion, or to put him on enquiry. All that can be said is, that he might have ascertained the facts if he had gone to the Auditor’s office and traced the bond- back to its source. But that is not enough to charge him with constructive notice of what he might there have ascertained, in the absence of anything to put him on enquiry. 2 Rob. Pr. 29; Opinion of Cabell, J., in French v. Royal Company, 5 Beigh 627. And according to the recent cases in England, a party will not be charged with constructive notice, unless the circumstances are such that the court can say that it was his duty to acquire the knowledge in question, and that his failure to obtain it was the result of culpable negligence. It is not enough that he should, from a want of prudent caution, have neglected to make enquiries; but he must have designedly abstained from such enquiries, for the purpose of avoiding knowledge; there must be a willful blindness, and not mere want of caution. Jones v. Smith, 1 Hare R. 55; S. C. on appeal, 1 Phillips R. 244; Ware v. Lord Egmont, 31 Eng. L. and Eq. R. 89. It was argued that DeVoss claims under assignment from Maury, and that it was his duty to look to Maury’s title, by tracing the bond back through the previous transfers. This, however, is not the title which DeVoss holds. He holds a new bond given directly to himself. The nature of his title will be more fully considered hereafter.
The validity of the bond held by DeVoss is controverted on the ground that the officers of the City by whom it was issued exceeded their authority in doing so. This objection is founded on the resolution of the Council passed April 14, 1862. This resolution directed, 1. That bonds of the city should be issued to H. B- Brooke, receiver, in obedience to the decree of confis *638 cation; and 2, in substance, that it should be stated on the face of such bonds, *and also on the face of all others that might be given in place of them, in case of transfer, 'that thejr were issued in place of bonds which had been confiscated. The object of this last provision was to give notice to purchasers of this class of bonds, so that they should cease to be binding on the City in case the decree of confiscation should be overthrown by the event of the war.
It is undoubtedly true thaf it was the intention of the Council, that no bond in lieu of a confiscated bond should be issued in any case without the special statement on its face required bjr the resolution. The prohibition is as plain as if the language of the resolution had been in the form of express prohibition. As between the City and the officers, therefore, it limited, in respect to this class of bonds, the authority of the officers.-
But the authority of these officers to transfer bonds and to issue new ones was not derived from this resolution. They had a general authority for these purposes conferred by the ordinance. They had long been in the habit also of making such transfers and renewals, from which the public might have inferred a general authority to do so'. This resolution, with a view to the protection of the City, directed the officers not to exercise their authority in respect to this particular class of bonds, except in a particular way. The officers were relied upon to observe this direction, and it does not appear in the record that the resolution was ever communicated to the public. There appears to be strong ground, therefore, to say, as was contended by the counsel for the appellants, that in respect to the public, this resolution did not operate as a limitation of the apparent power of the officers, which remained the same as before, but was only in the nature of private instructions as to the manner in which they should execute their authority in particular cases. If so, it is clear that the act of the officers in issuing the bond to DeVoss, in ^conformity with their apparent authority, was not vitiated by their omission to observe the . direction contained in the resolution.
But under the ordinance the officers had no authority to issue a new bond without the surrender of the old one, except in the case of a lost bond. The power to make the first issue of bonds in place of those which had been confiscated was derived, therefore, from 'this resolution alone. It was conferred on special terms in this, that the bonds were to be in a particular form, which was prescribed for an important purpose. Every bond that might be issued in place of these was also to have the same form. In this view, it may be contended, that this resolution had the effect, in respect to this class of bonds, of taking away from the officers the general power which they before had, and of substituting for it a new and limited authority, of which the public must take notice. I do not think it worth while to discuss this question, and will assume, for the purpose of the argument, that the view just stated is a sound one.
Assuming that the officers had then only a limited authority, of the extent of which the public were bound to take notice, in respect to the renewal of this class of bonds, the counsel for the appellee contended, that the bond held by DeVoss, which was not issued in conformity with this authority, cannot be held binding on the City. The counsel for the appellants contended, on the other hand, that the City cannot be allowed to avail itself of this defence against De-Voss, who took the bond issued to him without a knowledge of the fact that the officers exceeded their authority in issuing it. And I think this position may be maintained on principle and authority.
The City of Richmond is authorized by its charter to contract loans, without limit as to amount, and to issue bonds or certificates of debt for the money borrowed. It ^provided by an ordinance, which is a transcript of a law of the State, _ (Code of 1860, p. 264,) for the execution,’ transfer and renewal of these bonds or certificates. They are to be under seal, to be registered in the office of the auditor, and to be subscribed by the president of the council and the chamberlain. Upon the surrender of a certificate at the office in which it is registered, a transfer may be made of the whole amount, or any part thereof, by the person appearing on the books to be the owner, or bjr another bearing a power of attorney from him to make the transfer. When a transfer is made, the old certificate is to be cancelled and filed in the office of the chamberlain, and one or more new certificates issued. New certificates may be obtained by a holder, on application, in place of an old one, where there has been no transfer. Every new certificate is to be registered, signed and countersigned like the former one. Yfhen a certificate has been lost, the holder may obtain a new one on affidavit and three months’ advertisement of the loss, and upon giving bond and security to indemnify all persons against any loss by reason of issuing the new certificate.
The same ordinance also provides that the person appearing on the books of the office in which any certificate is registered, as ■ the owner thereof, shall be deemed the owner as regards the City, so as to make valid. all payments to him on account thereof by the City, made before a transfer of the certificate on the books of the officer. But if the person so appearing on the books as owner shall bona fide, and for valuable consideration, sell, pledge, or otherwise dispose of a certificate to another, and deliver to him the certificate, with a power of attorney authorizing the transfer thereof on the books of the proper office, the title of the former to said certificate (both at law and in equity) shall vest in the latter for the whole amount of the certificates, or so much thereof as may be necessary to *639 effect *the. purpose of the sale, pledge, or other disposition, and it shall so vest, not only as between the parties themselves, but also as against the creditors of, and subsequent purchasers from, the former, subject to the last preceding provision in respect to. pajments by the City.
Under these arrangements, ' the bonds of the City were put upon the market. It is manifest that a leading object contemplated by these arrangements was to give security to the title of holders of the bonds, and thus to promote their credit. If the bonds had been made so as to pass by assignment merely, each successive assignee would have taken only an equitable title, and the bonds in his hands would have been subject to the same defences to which they would have been subject in the hands of any prior holder. It is provided, however, that upon each successive transfer a new bond shall be issued in the name of the transferee, which will give him a legal title to demand payment of the money. See Union Bank v. Laird, 2 Wheat. R. 390; Black & al. v. Zacharie & Co., 3 How. U. S. R. 483; Risher & al. v. Essex Bank, 5 Gray’s R. 373. So an assignee for value, who receives a bond from the holder with a power of attorney to transfer it, acquires, under the ordinance, the legal title of the holder before a transfer on the books, subject only to the right of the city to make payment to the registered owner. The new certificate, or the delivery of an old certificate with a power of attorney to transfer it, will cut off all defences which the City might have against any prior holder. Ror the question, whether the holder of an obligation for the payment of money is subject to the defences of the debtor against a prior holder, depends, in the absence of notice or fraud, upon the character of his title, as legal or equitable. If it is an ordinary chose in action, and therefore only assignable in equity, it is subject to all the rights, legal and equitable, which the debtor had against a former ^'holder. Ror, while a court of equity will sustain the rights of the assignee, it will also sustain the rights of the debtor existing before notice of the assignment, and these being prior in time to those of the assignee, prevail over them. But where the assignee takes the legal title without fraud or notice, this principle does not apply; the title of the holder is absolute; and all defences of the debtor against prior holders are cut off.
The bona fide holder” of a bond issued to him stands, therefore, in this respect, in the position of the holder of a bill of exchange or negotiable note. This is conclusive to show that he is not bound to look behind the bond. The City cannot deny the title of the registered owner, who still holds his bond. Any other principle would lead to embarrassment and inconvenience, and greatly impair the credit of the bond. To require a holder to investigate the previous history of his bond, he must examine the books in the auditor’s office and the files in the chamberlain’s office, which are not open to public inspection. It would often be impossible for him to trace the history of his bond, from the union, under one name, of a number of bonds bought from different persons. On the other hand, it is the duty of the officers of the City to make every necessary investigation, at each successive transfer, and they have all the means of doing so.
It is of the very nature of such a bond, and the very object for which it is issued, that it shall furnish authentic and conclusive evidence of the holder’s title to demand the money it calls for. Such is the general understanding upon which such bonds and stocks are bought and sold in the market; and anjT other principle would be fatal to the credit of such securities. In Davis v. Bank of England, 2 Bing. R. 393 (9 Eng. C. R. R. 444), when the Bank had permitted certain stock in the public funds standing on the books of the Bank to be transferred under a forged *power of attorney, the Court of Common Pleas said: “We are not called on to decide whether those who purchase the stock transferred to them under the forged power might require the Bank to confirm that purchase to them and to pay them the dividends on such stocks, or whether* their neglect to enquire into the authenticity of the power of attorney might not throw the loss on them that has been occasioned by the forgeries; but to prevent, as far as we can, the alarm which an argument urged on behalf of the Bank is likely to excite, we will say that the Bank cannot refuse to pay the dividends to subsequent purchasers of their stocks. If the Bank should say to such subsequent purchasers, the persons of whom you bought were not legally possessed of 'the stock they sold you, the answer would be, the bank, in the books which the law requires them to keep, and for keeping which they receive a remuneration from the public, have registered these persons as the owners of these stocks, and the Bank cannot be permitted to say that such persons were not the owners. If this be not the law, who will purchase stock, or who can be certain that the stock which he holds belongs to him?' It has ever been an object of the legislature to give facility to the transfer of shares in the public funds. This facility of transfer is one of the advantages belonging to this species of property, and this advantage would be entirely destroyed if a purchaser should be required to look to the regularity of the transfer to all the various persons through whom such stock had passed. Indeed, from the manner in which stock passes from man to man, from the union of stocks bought of different persons under the same name, and the impossibility of distinguishing what was regularly transferred from what was not, it is impossible to trace the title of stock as you can that of an estate. You cannot look further, nor is it the practice ever to attempt to look further than the bank *books for the title of the person who proposes to transfer to you. ” In conformity with these *640 views, it was held in Bank of Kentucky v. Schuylkill Bank, 1 Parsons Sel. Ca. 180, in reference to spurious stock fraudulently issued by an agent of the bank, and transferred from time to time to innocent purchasers, that against bona fide holders of such stock the bank “would be estopped from going beyond its last certificate in any question between the bank and such holder, touching the obligatory force of such certificate on the corporation.” p. 250. To the same effect is the opinion of Redfield, J., in Sabin v. Bank of Woodstock, 21 Verm. R. 353, cited with approbation in Fisher v. Essex Bank, 5 Gray R. 373.
The common course of business in the sale and purchase of such bonds shows that such is the general understanding as to the character and effect of the bond. A party having a bond to sell delivers it to a broker, with a power of attorney authorizing an attorney to transfer it to-, the name of the transferee being left blank. When a purchaser is found, the blank is filled with the name, the transfer is made on the books, and a new bond issues to the purchaser. The purchaser takes the bond, but he seldom knows, and never cares, who held the previous bond.
There is nothing unreasonable or harsh in holding the City to be estopped from disputing the title of DeVoss. On the contrary, it is highly just and reasonable. The City appointed officers to issue its bonds, in whom it confided. It knew that its bonds were the subject of daily traffic, in and out of Richmond. Erom the nature of the business, it must have expected and intended the public to confide in these officers. There were two classes of bonds to be issued, and the class to which each bond belonged was to be indicated by its form. The officers were specially entrusted by the city with that duty; they had the means *of knowing the fact in every case, and could not make a mistake without gross negligence. These means were not equally open to the public.
Under these circumstances, it was natural that purchasers should presume that the officers did their duty. They had a right to rely on such a presumption in their dealings. Indeed, it was necessary for them to do so; and it would be unjust to allow the City to say to them, when they dealt in good faith, that they ought not to have relied on it.
The case of The Royal British Bank v. Turquand, 5 El. & Bl. R. 248 (85 E. C. L. R.), was an action against the official manager of a railway company (that being the mode of suing the company), upon a bond for ^2,000, payable to the plaintiff, and signed by two directors, under the seal of the company. There was a plea setting out a clause in the deed of settlement of the company, which provided that the company might borrow, on bond, such sums as should, from time to time, by a general resolution of the company, be allowed to be borrowed, and averring that there was no such resolution authorizing the making of this bond. The Court of Q. B. held the plea to be bad. The judgment was affirmed in the Exchequer Chamber, 6 El. & Bl. R. 327 (88 Eng. C. L. R.). Jervis, C. J., delivering the opinion of the whole court, said: “We may now take for granted that the dealings with these companies are not like dealings with other partnerships, and that the parties dealing with them are bound to read the statute and the deed of settlement. But they are not bound to do more. And the party here, on reading the deed of settlement, would find, not a prohibition from borrowing, but a permission to do so on certain conditions. Finding that the authority might be made complete, by a resolution, he would have a right to infer the fact of a resolution authorizing that which, on the face *of the documents, appeared to be legitimately done.”
In the case of The Prince of Wales Co. v. Harding, El. Bl. & El. 183 (96 Eng. C. ER.), which was an action against the official manager of the Athenaeum Assurance Company upon a policy, the deed of settlement provided (sect. 20,). that the common seal should not be affixed to any policy, except by the order of three directors, signed by them and countersigned by the manager; and that (sect. 28), every policy should be given under the hands of not less than three directors, and sealed with the common seal. The policy in question was sealed with the common seal and signed by three directors, one of whom was manager; but there was no previous order made, as required by the 20th section. The case was elaborately argued by the most eminent counsel. It was contended for the defendant, that the previous order required by the 20th section was a condition precedent to the power of the directors to affix the seal to the policy; that the directors were agents, with limited authority; that those who contracted with them had notice of the limits, because the statute conferred the authority subject to the provisions of the act and of the deed of settlement, which was registered for public inspection; and that the shareholders, as the principals, had a right to repudiate every policy not executed in pursuance of the authority given to the directors. The Court of Q. B., in an elaborate judgment, overruled this argument, and held that the policy was binding on the company. It was held that a person receiving a policy in good faith, had a right to presume that the directors who signed it had done their duty, and that they had the preliminary order for executing it.
The case of The Royal Bank v. Turquand was cited with approval by the Supreme Court in Commissioners of Knox county v. Aspinwall, 21 How. U. S. R. 539. The Board of Commissioners of a county were authorized by ^statute to subscribe for railroad stock, and to issue bonds of the county therefor, in case a majority of the voters of the county should so determine, after a certain notice should *641 be given of the time and place of election. The Board subscribed for the stock and issued the bonds, purporting to act in compliance with the statute. The required notice was not given, and it was contended that consequently the power to issue the bonds was ever vested in the Board. It was conceded by the court that e.very person dealing in the bonds was chargeable with a knowledge of the statute under which they were issued, and that as the Board was acting under delegated authority, he must show that the authority was properly conferred. But it was held, 1. That as the bonds imported on their face a compliance with the law under which they were issued, the purchaser was not bound to look further for evidence of a compliance with the conditions to the grant of the power. “The purchaser of the bonds had a right to assume that the vote of the county, which was made a condition of the grant of the power, had been obtained, from the fact of the subscription by the Board to the stock of the railroad company and the issuing of the bonds.” 2. That upon the true construction of the statute, the Board were the proper judges whether a majority of the votes in the county had been cast in favor of the subscription. The court said: ‘ ‘The right of the Board to act in an execution of the authority is placed upon the fact that a majority of the votes had been cast in favor of the subscription, and to have acted without ascertaining it, would have been a clear violation of duty, and the ascertainment of the fact was necessarily left to the enquiry and judgment of the Board itself, as no other tribunal was provided for the purpose. The Board was one, from its organization and general duties, fit and competent to be the depositary of the trust thus confided to it.” * “We do not say that *the decision of the Board would be conclusive in a direct proceeding to enquire into the facts previously to the execution of the power, and before the rights and interests of third parties had attached; but after the authority had been executed, the stock subscribed, and the bonds issued, and in the hands of innocent holders, it would be too late, even in a direct proceeding, to call it in question.”
This case has been followed in several subsequent cases in the same court, the latest of which is Supervisors v. Schenck, 5 Wall. U. S. R. 772, decided in 1867. In all these cases, the bonds in question were payable to bearer, and passed by delivery. That circumstance was not expressly made a ground of decision in the case of The Commissioners of Knox county v. Aspinwall, which proceeded on the principle of the case of Royal Bank v. Turquand, where the instrument was a common bond, payable to the plaintiff. In the case in 5th Wallace, the opinion, referring to the previous cases, says: “Where a corporation has power, under any circumstances, to issue negotiable securities, the decision of this court is, that the bona fide holder has a right to presume they were issued under the circumstances which give the requisite authority, and they are no more liable to be impeached in the hands of such a holder than any other commercial paper. ” This ground of decision is equally applicable to the present case. For, as we have already seen, the person to whom a bond of the City of Richmond is issued, and who takes it in good faith, takes a legal title, and is no more subject to defences which might be made against a former holder than he would be if he was the holder of negotiable paper.
It was part of the duty of the officers interested with the transfer and renewal of bonds to ascertain, in every instance after April 14, 1862, whether the bond transferred represented a confiscated bond, and to certify whether it did or did not in the form of the renewed bond. *When, therefore, these officers failed in any case, through negligence, to certify on the face of a bond issued by them that it represented a confiscated bond, when such was the fact, it was the common case of an agent acting negligently in the regular course of his employment. The law is well settled and familiar that, in such cases, the principal must bear the consequences of his agent’s negligence, as between himself and an innocent third person, even though the act or omission of the agent, which constitutes the negligence, was wholly unauthorized by the principal, or even positively forbidden by him. 1 Parsons Sel. Ca. 180; 14 How. U. S. R. 486. Upon this principle, a bank is held to suffer for the negligence of its officer, who received from an innocent person payment of debt in forged notes, which purport to be the issue of the bank. U. S. Bank v. Bank of Georgia, 10 Wheat. R. 333. So where an officer of a bank, through negligence, pays to an innocent holder a forged check, which purports to be drawn upon the bank by one of its customers. Levy v. Bank U. S., 1 Binn. R. 27. And so the bank must bear the loss where its officer permits a transfer of stock under a forged power of attorney, or is otherwise guilty of negligence or of fraud in the issue or transfer of stock. Davis v. Bank of England, ubi supra; Pollock v. National Bank, 3 Selden R. 274; Bank of Kentucky v. Schuylkill Bank, 1 Parsons Sel. Ca. 180; Bridgport Bank v. N. Y. & N. H. R. R. Co., 30 Conn. R. 231; N. Y. & N. H. R. R. Co. v. Schuyler & als., 34 N. Y. R. 30; Sewall v. Boston Water Power Co., 4 Allen R. 277.
The City bonds, as I have said, were put upon the market by the City, and were the subject of daily traffic. The public were invited to deal in them, and it was important to the credit of the City that they should do so with confidence and safety. To insure its own safety, and at the same time the safety of purchasers,' the City undertook *to mark the class of confiscated bonds. Upon principles of good faith and fair dealing, we must consider that the intention was, not only to admonish purchasers as to what bonds they could not buy without risk, but also to in *642 form them as to what bonds they might buy with safety. The absence of a statement in a bond, that it represented a confiscated bond, was equivalent to a representation to the person to whom it was issued, and to all others who might trade for it, that it did not represent such a bond. It was, in law, the representation of the City, because made in its behalf by officers charged by it with the duty of issuing all bonds, and of representing on the face of each whether it did not belong to the class of confiscated bonds.
Erom the nature of the business, the City knew that this representation, conveyed by the form of the bond, would be relied on, and must have intended that it should be. When a party has relied upon it, and in good faith paid his money on the faith of it, it would be the height of injustice to allow the City to say to him it is not true, and that it was his folly to believe it.
This case, therefore, falls within the principle of estoppel in pais, and the city must be held liable to DeVoss to the same extent as if the representation, conveyed by the form of the bond, was in fact true. It is not necessary, in order to bring a case within this principle of estoppel, that the representation should be made fraudulently, or with a positive intention to deceive; nor, on the other hand, is it enough that it has been relied on, in point of fact, when there was no intention that it should be, or reasonable expectation, from the course of business or otherwise, that it would be. The principle, as stated by Lord Denman in Pickard v. Sears, 6 Ad. & El. R. 469, (33 Eng. C. L. R. 115,) is, that “where one, by his acts or conduct, wilfully causes another to believe the existence of a certain state of things, and induces him to act on *that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things existing at the same time.” In Freeman v. Coke, 2 Exch. R. 663, Baron Parke, delivering the judgment of the court, said, that by the term “wilfully,” as here used by Bord Denman, we “must understand, if not that the party represents that to be true which he knows to be untrue, at least that he means his representation to be acted upon, and that it is acted upon accordingly; and if, whatever a man’s real intention may be, he so conducts himself that a reasonable man would take the representation to be true, and believe that it was meant that he should act upon it, and did act upon it, as true, the party making the representation would be equally precluded from contesting its truth ; and conduct by negligence or omission, where there is a duty cast upon a person, by usage of trade or otherwise, to disclose the truth, may often have the same effect.” Here the duty of making known the truth as to the character of every bond issued after April 14,-1862, was cast upon the City by its own undertaking.
In a case in which a corporation put its bonds-upon the market, under certain implied representations inviting public confidence in their validity and value, but where no direct and express representation had been made to the particular purchaser, the Supreme Court said: “A corporation, quite as much as an individual, is held to a careful adherence to truth in their dealings with mankind, and cannot, by their representations or silence, involve others in onerous engagements, and then defeat the calculations and claims their own conduct has superinduced.” Zabriskie v. C. C. & C. R. R. Co., 23 How. U. S. R. 381. The same language was repeated, subsequently, in the case of a municipal corporation. Bissell v. City of Jeffersonville, 24 How. U. S. R. 287.
*It was said in the argument by the counsel for the appellee, that the City itself had no authority under the charter to execute the bond to DeVoss, because it was not given for money lent to the city, or for any other sufficient consideration. But the City had authority to execute bonds, in proper cases, without limit as to number or amount, and for reasons already mentioned, it cannot allege against DeVoss that this particular bond was not executed in a proper case. And it is at least doubtful, upon the authorities, whether a corporation can, in any case, allege against a third person, who has contracted with it, that its contract was void because ultra vires, where the other party had no knowledge of the facts which made it so. Eastern Counties R. Co. v. Hawkes, 35 Eng. L. & Eq. R. 8; Bateman v. Mayor, &c., 3 H. & Nor. 323; Bissell v. Mich. E. & N. Ind. R. R. Co., 22 N. Y. R. 258. If this had been the case of shares of stock issued in excess of the number limited by the charter, the case would have been different; for, in such a case, as was said in the case of N. Y. & N. H. R. R. Co. v. Schuyler & al., 34 N. Y. R. 30, the validity of such shares is a- legal impossibility.
There is a class of cases in New York, relied on for the appellants, in which it has been settled, as the law of that State, applicable to all cases of agency, that where, upon comparing the act of the agent with the power given to him, it appears to be such an act as the agent may lawfully do under the power, and the question whether it was in fact done in conformity with the power, or was an abuse of it, depends upon the state of extrinsic facts within the knowledge of the agent, and not known to the other party, such other party has a right to presume that the state of extrinsic facts is such as to authorize the act, and the principal will be bound. The doing by the agent of an act of such a kind, that it may be within the power, is regarded *as a representation by him that, in point of fact, it is within it- — a representation which, it is held, he has authority from the principal to make, resulting by implication from his employment, and all persons dealing in good faith are held entitled to rely on the truth of this representation. North River Bank v. Aymar, 3 *643 Hill R. 262; F. & M. Bank v. B. & D. Bank, 16 N. Y. R. 125; Exch. Bank v. Monteath, 26 N. Y. R. 505; Griswold v. Haven, 25 N. Y. R. 596; N. Y. & N. H. R. R. Co. v. Schuyler & al., 34 N. Y. R. 30. This doctrine was not established without strong opposition, and was objected to as unsound in principle, and in conflict with authority. Mech. Bank v. N. Y. & N. H. R. R. Co, 3 Kernan R. 599; Opinion of Comstock, J., 16 N. Y. R. 125, and cases cited. See also, Stagg v. Elliott, 12 C. B. R. N. S. 373 (104 Eng. C. E. R.); Mussey v. Beecher, 3 Cush. R. 511; Sears v. Wingate, 3 Allen R. 103; Mann v. King, 6 Munf. R. 428; Stainback v. Read & Co., 11 Gratt. R. 281; Same v. Bank of Va., Ibid. 260.
If this doctrine is sound, it has a conclusive application to the present case. But I have not found it necessary to invoke so broad a principle, and as there seems to be difficulty in reconciling the authorities, I have thought it best to decide this case upon its own special circumstances, and to leave the general question open until a case shall arise which renders its decision necessary.
I am of opinion that the decree should be reversed and the bill dismissed.
The other judges concurred in the opinion of Joynes, J.
Decree reversed.
MUNICIPAL, COUNTY, AND STATE BONDS.
A. Comity and Municipal Bonds.
1. Authority to Issue'.
2. Interest.
3. Defences, a. Usury.
1). Bona Fide Purchaser, c. Defences — Estoppel.
4. Redemption.
5. Remedy — Subrogation.
B. State Bonds-- Coupons.
1. When Payments in Coupons Allowed.
2. Virginia Statutes -Scope.
3. Commencement of Snit.
4. Rnles of Evidence.
5. Defence.
6. Burden of Proof.
7. Jurisdiction of Courts.
In connection with this subject, see monographic note on “Municipal Corporations” appended to Dan-ville y. Pace, 25 Gratt. 1. and on “Usury” appended to Coffman v. Miller, 28 Gratt. 698.
A. COUNTY AND MUNICIPAL BONDS.
1. Authority to Issue.
County and Municipal Bonds — Authority to issue.—
A county has no inherent right to borrow money and give its bonds for payment. Snch power may be granted it by the legislature either in express terms or by implication; in view however of the dangerous nature of such authority, its great liability of abuse and the constant habit of the legislature to grant it in terms, when intended, the implication, to be justified, should be very clear if not irresistible. Bonsack v. Roanoke County, 75 Va. 585.
A municipal corporation cannot without legislative authority, become the surety for another corporation or individual; cannot guarantee the bonds or obligations of another, or make accommodation endorsements. Snch authority cannot be implied or deduced from the general or usual powers conferred upon such corporations. In accord with this view it was held that the city of Lynchburg had no power under the Acts 1884, p. 181, ch. 124, § 8, (Acts 1887, p. 399, ch. 302, § 7, cl. 37), to guarantee the payment of certain bonds issued by a corporation. Lynchburg, etc., Street Ry. Co. v. Dameron, 95 Va. 545, 28 S. E. Rep. 951.
The competency of the legislature to authorize counties or other municipalities to subscribe to the stock of a railroad company, and to issue bonds in payment of snch subscriptions, is unquestionable. And this authority may be conferred with or without the sanction of a popular vote. Supervisors v. Randolph, 89 Va. 614, 16 S. E. Rep. 722; Redd v. Supervisors, 31 Gratt. 695.
The power of the legislature to authorize a county or other municipality to make a subscription to the stock of the railroad company, and to issue bonds with which to pay it, is settled in this state. And it is also settled that if, by reason of mistake, carelessness, or other causes, the conditions precedent to the exercise of such power by the municipality have not been complied with, the legislature can cure all irregularities by subsequent legislation, and make such contracts as valid and binding as if all the conditions precedent had been complied with. Bell v. F. etc., R. Co., 91 Va. 99, 20 S. E. Rep. 942: Redd v. Supervisors, 31 Gratt. 695; Supervisors v. Randolph, 89 Va. 614, 16 S. E. Rep. 722.
That express power to a municipal corporation to borrow money includes the power to issue its bonds, or other usual securities, to the lender, is a proposition now too well settled to be questioned. Without such incidental power, the power to borrow money would ordinarily be nugatory, and wherever a general power to do a thing is given, every particular power necessary for doing it. is included. Bunch v. Fluvanna Co., 86 Va. 452, 10 S. E. Rep. 532.
Sound reason, no less than authority, forbids that it should be held that a corporation may not incur a debt in the exercise of its appropriate powers, or may not purchase, upon a credit, property which is required for purposes authorized by its charter. Having the power to make the purchase, it had authority to do so upon a credit to which there was no limit but its own discretion, and the right to give bonds would follow as a necessary consequence: for power to contract a debt must carry with it power to give a suitable acknowledgment of the indebtedness. Richmond, etc., Imp. Co. v. West Point, 94 Va. 674, 27 S. E. Rep. 460.
A municipal corporation having a general authority under its charter to contract loans or cause to be issued certificates of debt or bonds, may issue coupou bonds and sell them at public auction for less than theirpar value, and for bonds sold during the war might receive payment for them in confederate money. City of Lynchburg v. Slaughter, 75 Va. 57.
Legislative authority, to issue “coupon bonds,” implies authority to issue bonds and coupons payable to bearer, which are negotiable instruments, having all the qualities and incidents of commercial paper. Supervisors v. Randolph, 89 Va. 614. 16 S. E. Rep. 722; Arents v. Com., 18 Gratt. 750.
In an ordinance the authorization of bonds not to *644 exceed $6,000 is equivalent, in legal effect, to fixing the amount of such Ibonds at such sum. In either case, the authorities would only have the right to issue bonds sufficient to cover the purpose for which the ordinance is adopted. Knight v. Town of West Union, 45 W. Va. 104, 32 S. E. Rep. 163.
The county court of Ohio county, having been authorized by the voters of that county at an election held according to law, to subscribe the sum of three hundred thousand dollars to the Hemp-Field Railroad Company, may issue bonds for that amount due in twenty years, with interest payable semi-annually. Goshorn v. Supervisors, 1 W. Va. 307.
Section 8, art. 10, of the constitution of West Virginia 1872, does not show an intent to authorize the legislature to empower cities, towns or municipal corporations to issue bonds for other than corporate purposes. Bonds purporting to be issued under this section for the aid of individual interest are illegal, null and void. Ohio Val. Iron Works v. Town of Moundsville, 11 W. Va. 1; List v. Wheeling, 7 W. Va. 603; Kaufle v. Delaney, 25 W. Va. 410.
Equity Jurisdiction — Enjoining Issuance of Bonds.— Though the act of January 15th, 1875, Sess. Acts 1874 ch. 37, p. 29, provides a mode by which the qualified voters Of .a county or corporation may contest the due returns of the election or decision of the voters of said county or corporation upon the question whether the county or corporation shall subscribe to the stock of an internal improvement company, a court of equity still has jurisdiction of the question upon a bill filed by fifteen or more of the citizens and taxpayers of the county or corporation, and to enjoin the issue-of the bonds of said county or corporation in payment of said subscription if the proceeding has not been properly conducted. Redd v. Supervisors Henry County, 31 Gratt. 695.
Huniclpal Securities — Sale under Invalid Order-Rights of City. — F was the owner of $8,700 of the certificates of stock of the city A, which by a decree of the United States court in May, 1864, were confiscated and sold by the marshal, and $2,000 of it purchased by W; and at his request the marshal made a transfer of the same on the books of the city. When the stock became dueW received from the city of A four coupon bonds of $500 each in exchange for his stock. In 1874 F sued the city for his stock and recovered it, the court holding that the decree of the United States court confiscating it was invalid. The city of A then sued W to recover the four bonds issued to him for the stock. Held, the city of A is entitled to recover the bonds. Webb v. Alexandria, 33 Gratt, 168.
Under the constitution of Virginia of 1830, an act authorizing the common council of the city of Lynchburg to tax persons and property within the corporate limits, and for half a mile around and outside of the corporate limits, to pay the interest upon the guaranty by the city of six per cent, per annum upon the stock of the Virginia and Tennessee Railroad Company, to the amount of half a million of dollars, is not a violation of that constitution. Langhorne v. Robinson, 20 Gratt. 661.
County Bonds — Authority to Issue — Strictly Construed. — A county court acting under the statute authorizingcounty courts to purchase salt, is exercising a special authority, and it must appear from the record that the justices were summoned, or a majority were present, when a bond was executed for salt purchased, or the bond will be held to be null and void. Dinwiddie County v. Stuart, 28 Gratt. 526.
2. Interest.
Bonds — Interest Coupons — Effect.—A railroad company not having been able to pay the interest on its bonds, gave to the holders of the interest coupons the coupon bonds of the company for the amount of the said interest. Held:
1. This was not a novation of the debt for the interest; and these bonds are secured by the mortgage,
2. The coupons for interest bore interest from the time they were payable. Gibert v. Washington City, Virginia Midland & Great Southern Railroad Company, 33 Gratt. 586; Fidelity Ins., etc., Co. v. Shenandoah Val. R. Co., 86 Va. 1, 9 S. E. Rep. 759.
3. Defences.
a. Usury. — City bonds, payable thirty years after date, and bearing six per cent, per annum interest from their date, sold in 1864, for confederate money, at the rate of two and one-half for one, when confederate money was at the rate of twenty to one for gold. City of Lynchburg v. Norvell, 20 Gratt. 601.
This Is Usury. — The fact that thesebonds might be paid in the currency which at the time they fell due would he taken by the state for taxes, does not constitute such a contract of hazard as relieved it from the taint of usury. City of Lynchburg v. Norvell, 20 Gratt. 601.
Municipal Bonds — Usury.—The council of the town of Danville has authority, under its charter, to contract loans and issue certificates of debt. In 1863, the council sold the bonds of the city, to he issued, at public auction for confederate money, and for a bond of $5,000, bearing six per cent, interest, and payable at the end of twenty -years, the purchaser gave $11,050 ; confederate currency being at the time as ten for one of gold. This is usury. Town of Danville v. Sutherlin, 20 Gratt. 555. See monograhic note on “Usury” appended to Coffman v. Miller, 26 Gratt. 698.
b. Bona Fide Purchaser— If a municipal corporation has the power to issue bonds, and the bonds are free from conditions and negotiable, a bona Me purchaser before maturity is not bound'to inquire for what purpose the issue was actually made, or to see to the application of the purchase money. Town of Clifton Forge v. Bank, 92 Va. 283, 23 S. E. Rep. 284; Town of Clifton Forge v. Electric Co., 92 Va. 289, 23 S.E. Rep. 288; City of Lynchburg v. Slaughter, 75 Va. 57.
The holder of negotiable paper is presumed to have taken it before maturity, for valuable consideration and without notice of any objection to which it was liable, and this presumption stands until overcome by sufficient proof. To impeach his title by proof of any facts and circumstances outside of the instrument itself, it must first he shown that he had notice of such facts at the time the purchase was made. Such a holder is not affected by anything which has occurred between other parties unless he had knowledge thereof at the time of the purchase, and he is entitled to transfer all his rights unimpaired to a third person, although such transferee be acquainted with defences against the paper. Negotiable bonds delivered in escrow and wrongfully put in circulation are valid in the hands of a bona fide holder for value and without notice. Nor is such a holder affected with constructive notice of a snit respecting'such Pickens v. Post, 5 Va. Law Reg. 789. paper.
*645 An individual’purchasing tlie 'bonds of a municipal corporation, and haying no actual notice Of any special directions given to the officers of the company in relation to the particular bonds purchased, -will only he hound by such directions if he has heen wilfully ignorant of them ; and not merely where there has heen a want of caution. DeVoss v. City of Richmond, 18 Gratt. 338.
The fact that the act of the legislature authorizing the issue of such bond is unconstitutional is a valid defence even against a dona Ude holder for value. Pickens v. Post, 5 Va. Law Reg. 789.
c. Defences — Estoppel.—In a suit by a dona fide holder before maturity for value and without notice brought oh county bonds issued in aid of the construction of a railroad, the county is estopped by the certificate of the proper officers, appearing pn the face of the bond, to the effect that all the conditions precedent to the issuing of such bonds have been fully performed, from setting up any irregularities of the proceedings antecedent to the preparation, execution and issuance of the bonds. Pickens Township v. Post, 5 Va. Law Reg. 789.
4. Redemption.
Bonds — Redemption—Effect.—Bonds issued to aid a railroad company were payable upon a condition whose performance was secured by mortgage. The company received and hypothecated part of said bonds. Upon a sale of the railroad under a second mortgage part of the proceeds of the sale were applied to redeem the hypothecated bonds. Held, the purchasers were not entitled to the redeemed bonds until they first refunded the proceeds applied to their redemption. W. O., etc., Co. v. Lewis, 83 Va. 346, 2 S. E. Rep. 746.
5. Remedy — Subrogation.
County Bonds — Subrogation.—Where a railroad company receives from the county conditional coupon bonds by way of subscription and gives a mortgage to insure the performance of the condition, a purchaser from the railroad company for value and without notice is entitled to be substituted to the benefit of the mortgage security. W., O., etc., R. Co. v. Cazenove, 83 Va. 744, 3 S. E. Rep. 443.
B. STATE BONDS — COUPONS.
l. When Payments in Coupons Allowed.
Delinquent Taxes — Coupons of State Bonds Receivable for. — The act of March 30, 1871, entitled “An act to provide for the funding and payment of the public debt,” provides that the coupons attached to the bonds to be issued under that act “shall be payable semi-annually, and be receivable at and after maturity, for all taxes, debts, dues and demands due the state; which shall be expressed on their face.” The act constitutes a contract on the part of the state, which cannot be repealed by the General Assembly, and the contract follows the coupons in the hands of the holders thereof, though purchased after an act repealing the said act. Antoni v. Wright, 22 Gratt. 833; Hartman v. Greenhow, 103 U. S. 673; Antoni v. Greenhow, 107 U. S. 769; Poindexter v. Greenhow, 114 U. S. 370, 5 S. E. Rep. 903; McGahey v. Virginia, 135 U. S. 668; Royall v. Virginia, 116 U. S. 573.
The act of March 7,1873, which directs what shall be received in payment of taxes, dues, etc., to the state, and repeals all acts inconsistent with it, so far as it respects the provision of the act of March 30, 1871. in relation to the coupons of bonds issued under this last act, is repugnant to the provision of the constitution of the United States, which forbids a state to pass any law impairing the obligation of contracts. Antoni v. Wright, 33 Gratt. 833.
The overdue coupons upon bonds issued under act of March 28, 1879, are receivable for all taxes levied by the state, including the capitation tax; and the auditor is bound to receive them, when offered in payment of taxes returned delinquent to his office. Williamson v. Massey, 38 Gratt. 237; Greenhow v. Vashon, 81 Va. 350; Antoni v. Wright, 23 Gratt. 833, and note; C. & O. R. Co. v. Miller, 19 W. Va. 408; Com. v. Smith, 76 Va. 477; Com. v. Guggenheimer, 78 Va. 71.
L. holding coupon bonds issued under act of March 1871, after the passage of the act of March 19, 1873, received from the auditor of the state two-thirds of the interest due thereon, and in 1880 offered the said coupons in payment of taxes due to the state to the extent of the remaining one-third, field, L. is entitled to pay his taxes in this manner, and a mandamus should be awarded to compel the receipt of the said coupons by the treasurer. Lee v. Harlow, 75 Va. 22.
Fines — Payments in Over=Bue Coupons. — Fines imposed for a violation of law are embraced in the act of 1871 known as the funding act, and a person upon whom such a fine is imposed, may discharge it by the over-due coupons taken from the bonds mentioned in said act. Clarke v. Tyler, 30 Gratt. 134.
Fines — Payment in Coupons — Mandamus.—Eines collected by the sheriff of a county, or by the sergeant of a city or town, are to be paid by him to the treasurer of his county, city or town, and not to the auditor of accounts of the state; and therefore a mandamus will not lie at the suit of a sheriff or sergeant, to compel the auditor to receive coupons which have been paid to him in a discharge of a fine. Tyler v. Taylor, 29 Gratt. 765.
In the case of Huckless v. Childrey, 135 U. S. 662, 19 Sup. Ct. Rep. 986, the supreme court of the United States decided that the act of the Virginia legislature authorizing the receipt of coupons on,or after maturity in payment of “all debts, dues, and demands due the state” had no application to the case of a license tax payable for a license to sell by retail wine, spirits and other intoxicating liquors. The court said; “We are of opinion that the requirement that the license fee shall be paid in lawful money of the United States does not, as contended, impair the obligation of the contract made by the state with the holders of the coupons referred to. Licenses for the sale of intoxicating liquors are not only imposed for the purpose of raising revenue, but also for the purpose of regulating the traffic and consumption of these articles, and hence the state may impose such conditions for conducting said traffic as it may deem most for the public good. The manner of payment is part of the condition of the license intended as a regulation of the traffic. It would be very different if the business sought to be followed was one of the ordinary pursuits of life, in which all persons are entitled to engage. License taxes imposed upon such pursuits and professions are imposed purely for the purpose of revenue, and not for the purpose of regulating the traffic or the pursuit.” In accord with thelast proposition,of this quotation, see the case of Royall v. Virginia, 116 U. S. 572.
In the -case of Vashon v. Greenhow, 135 U. S. 716, 10 Sup. Ct. Rep. 987, the question of the validity of the act of the Virginia legislature authorizing the payment in coupons of “all debts, dues, and demands due the state,” was considered in relation to school taxes. It was held that, so far as the act applied to the school or literary fund, it was in contravention *646 of the constitution of Virginia in force at the time of the said enactment. The court said: “We think that the position of the court of appeals in this case is well taken, — that coupons could not he made receirahle as a portion of the literary fund, and that, if they could not he received as part of the fund, they could not properly he made receivable for the taxes laid for the purpose of maintaining said fund.” It was accordingly held that the law requiring the school tax to he paid in lawful money of the United States was a valid law, notwithstanding the provisions of the act of 1871, and that it was sustained hy the constitution of Virginia antedating the law of 1871, and overriding any provision therein repugnant to said constitution.
In the case of Com. v. McCullough, 90 Va. 597, 19 S. E. Rep. 114, we find what appears to he the final solution of the coupon legislation. The supreme court of the United States had decided in the case of Vashon v. Greenhow, 135 U. S. 716, that the acts of the Virginia legislature authorizing the receipt of coupons in payment of all “debts, dues and demands due the state,” were void so far as they related to the literary or school fund. In the case of Com. v. McCullough, supra, it was held that since these acts contemplate an entire contract, the supposed contract being void in part was void in entirety and wholly unconstitutional. Acts of Assembly 1891-92, pp. 533-43.
2. Virginia Statutes — Scope.
Act of 1871 — Bonds—Funding Act. — The holder of bonds of the state issued before the war to the Kanawha Board of the James River and Kanawha Company, under § 9 of the act of March 23d, 1860, is entitled to have them transferred upon the books of the 3d auditor, and funded under the provisions of the act of March 30, 1871, as amended by the repealing clause of the act of March 7,1872, entitled an act declaring what shall be received in payment of taxes, etc. Robinson v. Rogers, 24 Gratt. 319.
■ Public Debt — State Bonds — Statutes.—The act of March 30th, 1871, which authorized the holders of state bonds to invest them in tax-receivable coupon bonds, was modified and repealed as to the tax receivable coupons by the act of March 7th, 1872, and was wholly repealed by the act of March 28th, 1879, entitled “an act to provide a plan of settlement of the public debt.” And a holder of state bonds applying in November, 1879, cannot have them funded under the act of March, 1871, in tax-receivable coupon bonds. Paulsen v. Rogers, 32 Gratt. 654.
The act of January 14, 1882, entitled “an act to prevent frauds upon the commonwealth and the holders of her securities, in the collection and disbursements of her revenues” applies in terms only to coupons detached from bonds of the commonwealth issued under the act of 1871. Com. v. Smith, 76 Va. 477; Com. v. Guggenheimer, 78 Va. 71.
Bonds of i8<5a. — The obligations created in the name of the state of Virginia, by the general assembly which satin Richmond, at its session of 1861-62, are embraced by article 10, § 10, of the constitution of Virginia, which forbids that any provision shall be made for their payment. Meredith v. Rogers, 24 Gratt. 172.
Sale of .Coupons — License.—§ 65, ch. 450,'Acts of Assembly 1883-4, p. 590, requiring a special license for the sale of tax-receivable coupons cut from the bonds, of the state of Virginia is not repugnant to the constitution of the state of Virginia or that of the United States. Com. v. Lucas, 84 Va. 303, 4 S. E. Rep. 695; Com. v. Larkin, 84 Va. 517, 5 S. E. Rep. 526; Com. v. Plunkett, 84 Va. 519,9 S. E. Rep. 1120; Com. v. Krise, 84 Va. 521, 9 S. E. Rep. 1121; Cuthbut v. Com., 85 Va. 899, 9 S. E. Rep. 16; Com. v. Maury, 82 Va. 883, 1 S. E. Rep. 185.
3. Commencement oe Suit.
Bond — Commencement of Suit. — Under act of January 26,1882, the proper proceeding to commence a suit on a coupon detached from a bond was by petition filed at rules; and in such case a suit begun by a summons sued out of the clerk’s office should be dismissed on motion. Dunnington v. Ford, 80 Va. 177.
4. Rules oe evidence. — The act of March 4, 1886, declaring the method of obtaining licenses and declaring that if coupons be tendered therefor no license shallbe issued until the coupons are verified udder the act of January 14,1882, it is not repugnant to article 1, § 10 of the constitution of the United States which forbids “a state to pass any law impairing the obligation of contracts. ” Com. v. Jones, 82 Va. 789, 1 S. E. Rep. 84.
The act of January 26,1886, requiring, in a suit to test the genuineness of coupons purporting to be cut from state bonds, the production of the bonds with proof that the coupons were actually cut therefrom, is not repugnant to art. I., § 10 of the constitution of the United States. It is the province of the legislature to prescribe rules of evidence to govern the procedure of the state courts and the constitution of the United States has no application in such case. Cornwall v. Com., 82 Va. 644; Newton v. Com., 82 Va. 647; Com. v. Weller, 82 Va. 721, 1 S. E. Rep. 102; Com. v. Booker, 82 Va. 961, 7 S. E. Rep. 381; Va. Code 1887, § 412; McGahey v. Com., 85 Va. 519, 8 S. Rl- Rep. 244; Bryan v. Com., 85 Va. 526, 8 S. E. Rep. 246; Cooper v. Com., 85 Va. 528, 8 S. E. Rep. 247; Laube v. Com., 85 Va. 530, 8 S. E. Rep. 246; In re Ayres, 123 U. S. 485; Com. v. Larkin, 88 Va. 422, 13 S. E. Rep. 901.
Where the petitioner has, in accordance with the refunding act of February 20, 1892, surrendered certain coupon bonds to the commonwealth, no production of those bonds in court is required to prove the coupons as is directed by sec. 412 of the Code. Com. v. Ford, 89 Va. 427, 16 S. E. Rep. 277.
6. Deeenoe. — When coupon bonds have been stolen or unlawfully abstracted from the custody of the state after they had been redeemed and taken in, the state is not liable for them to the holders, although they be bona fide purchasers for value, and without notice. Branch v. Commissioners, 80 Va. 427.
6. Burden oe Prooe.
Spurious Bonds — Burden of Proof, — Under § 412 of the Code, the burden of proving spurious bonds produced in evidence as directed by that statute is upon the commonwealth. Com. v. Dunlop, 89 Va. 431, 16 S. E. Rep. 273.
In a proceeding to try the question as to whether certain alleged tax-receivable coupons were genuine or not, it was competent for the commonwealth to show that the bonds were not genuine, in order to show that the coupons detached were spurious, and .therefore not “legally receivable for taxes;” and to show this it was not necessary that a plea of non est factum should have been filed. Com. v. Hurt, 85 Va. 918, 9 S. E. Rep. 148; Com. v. Adams, 85 Va. 931, 9 S. E. Rep. 148; Com v. Tunstall, 86 Va. 372, 10 S. E. Rep. 414.
7. Jurisdiction oe Courts.
Negotiable Notes — County Bonds — Jurisdiction of State Court. — c, trustee of a bank in liqnidation, transfers to B the note of A, due to the hank, and certain county bonds which had heen deposited
*647 with tlie "bank by A as security for his note, to he applied first to pay a debt due B, and then for the trustee. After this transfer an order was made in a suit of the circuit court of the United States, in which C, as trustee of the hank was a defendant, appointing- 0 receiver in cause. The note having been protested for nonpayment, B gives A notice that, unless the note was paid by a day specified, he would proceed to sell the county bonds ; and the note not having been paid, B advertises the bonds to be sold at auction, specifying time and place. Notice of this sale is not given to A, but he has knowledge of it. A files a bill to enjoin the sale, making B and 0 defendants. Held, the transfer, of the note and bonds to B, having been made before the appointment of 0 as receiver, the state court has jurisdiction of the case. Alex., L. & H. R. Co. v. Burke, 22 Gratt. 254.
State Bonds — Jurisdictional Amount. — in cases necessarily involving the validity of coupons cut from bonds issued under Acts March 80, 1871, and March 28,1879, no jurisdictional amount is necessary to give supreme court of Virginia jurisdiction of the case. In such cases, art. 6, § 2 of the Constitution of Virginia applies. Com. v. McCullough, 90 Va. 597, 19 S. E. Rep. 114.